# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Aaron M. Ogletree | ) | Case No. 1:21-cv-00500 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| vs. | ) | **Plaintiff's motion for summary** |
| | ) | **judgment** |
| Cleveland State University, et al. | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Aaron Ogletree respectfully moves for summary judgment. There are no genuine issues of material fact for trial and Plaintiff is entitled to judgment as a matter of law. A memorandum in support is attached.

Respectfully submitted,

 /s/ Matthew D. Besser
Matthew D. Besser (0078071)
Cathleen M. Bolek (0059884)
**Bolek Besser Glesius LLC**
Monarch Centre, Suite 302
5885 Landerbrook Drive
Cleveland, Ohio 44124
T 216.464.3004
F 866.542.0743
cbolek@bolekbesser.com
mbesser@bolekbesser.com

*Counsel for Plaintiff*

## TABLE OF CONTENTS

Table of authorities...................................................................................................ii

Issues presented ...................................................................................................... 1

Brief factual overview............................................................................................. 1

      A.    CSU has a comprehensive series of procedural and technological
           remote-testing safeguards that do not entail a search of student homes.
           ................................................................................................................... 1

      B.    CSU inconsistently employs a practice of preemptively searching
           student homes or bedrooms by video before proctoring some online
           tests. ................................................................................................................ 4

Summary of the argument ...................................................................................... 6

Law and analysis ..................................................................................................... 8

      I.    CSU's unwritten practice of suspicionless video searches of student
          homes violates the Fourth Amendment. ................................................... 9

      A.    Conducted without reasonable suspicion that a particular search will
           uncover evidence of a rule violation, CSU's room scan practice is not
           "justified at its inception."................................................................... 10

      B.    Requiring students to show their homes or bedrooms to school officials
           is unreasonably intrusive because it is neither necessary nor sufficient
           to detect and deter cheating on remote tests. ....................................... 13

      1.    A room scan is not necessary to preserve test integrity. ........................ 15

      2.    A room scan is not sufficient to preserve test integrity. ....................... 17

Conclusion............................................................................................................. 19

Certificate of service ............................................................................................ 19

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Bd. of Educ. of Indep. Sch. Dist. of Pottawatomie Cty. v. Earls*, 536 U.S. 822 (2002) ........................................................................................................................... 11

*Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598 (6th Cir. 2005) ............................. 13

*Brannum v. Overton County Sch. Bd.*, 516 F.3d 489 (6th Cir. 2008) ....................... 13

*Cummerlander v. Patriot Preparatory Acad., Inc.*, 86 F. Supp. 3d 808 (S.D. Ohio 2015) ................................................................................................................. 10, 11

*Doe v. Champaign Community Unit 4 Sch. Dist.*, C.D. Ill. No. 11-3355, 2015 U.S. Dist. LEXIS 70075 (May 29, 2015) ......................................................................... 10

*Doe v. Little Rock Sch. Dist.*, 380 F.3d 349 (8th Cir. 2004) ....................................... 10

*Ellington v. City of E. Cleveland*, 689 F.3d 549 (6th Cir. 2012) ................................... 8

*Florida v. Jardines*, 569 U.S. 1 (2013). ...................................................................... 13

*G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623 (6th Cir. 2013) ........................... 9, 10, 12

*Gray v. Great Valley Sch. Dist.*, 102 F. Supp. 3d 671 (E.D. Pa. 2015) ...................... 10

*Highhouse v. Wayne Highlands Sch. Dist.*, M.D. Pa. No. 3:16-cv-00078, 2018 U.S. Dist. LEXIS 162703 (Sep. 24, 2018) ..................................................................... 10

*Kyllo v. United States*, 533 U.S. 27 (2001) ...................................................... 14, 15, 18

*Mendoza v. Klein Indep. Sch. Dist.*, S.D. Tex. Civil Action No. H-09-3895, 2011 U.S. Dist. LEXIS 166686 (Mar. 15, 2011) ..................................................................... 11

*New Jersey v. TLO*, 469 U.S. 325 (1985) ...................................................... 6, 9, 10, 13

*Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619 (6th Cir. 2018) .................... 8

*R.D. v. Concord Community Sch.*, N.D. Ind. No. 3:19-CV-823-PPS, 2021 U.S. Dist. LEXIS 131963 (July 15, 2021) ................................................................................ 10

*S.S. v. Turner Unified Sch. Dist.*, D. Kan. No. 12-CV-02346-CM, 2012 U.S. Dist. LEXIS 177316 (Dec. 14, 2012) ............................................................................... 11

*Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364 (2009) .......................... 10, 11

*Shade v. City of Farmington*, 309 F.3d 1054 (8th Cir. 2002) .................................... 10

*Silverman v. United States*, 365 U.S. 505 (1961) ................................................. 13, 18

*Smyth v. Lubbers*, 398 F. Supp. 777 (W.D. Mich. 1975)............................................. 19

*United States v. Karo*, 468 U.S. 705 (1984) ................................................................ 13

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) ............................................. 11

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................ 8

<u>ISSUES PRESENTED</u>

(1)     The Fourth Amendment demands that public school officials have reasonable suspicion before searching a member of the general student body for evidence of a rule violation. Before some remote tests, Cleveland State University officials commandeer some students' webcams to preemptively search their homes—and even their bedrooms—without any reason to believe the particular student might cheat on the test. Does the University conduct these searches without the reasonable suspicion the Fourth Amendment requires?

(2)     The Fourth Amendment also requires that any search of the general student body be reasonable in scope. The University uses student webcams to peer into their homes despite having a comprehensive series of less-intrusive safeguards against cheating on remote tests, which it calls effective. At the same time, it admits that a room scan would not prevent the common tactics students might use to cheat during an in-person test. Is the University's room scan practice unreasonable?

<u>BRIEF FACTUAL OVERVIEW</u>

A.     *CSU has a comprehensive series of procedural and technological remote-testing safeguards that do not entail a search of student homes.*

Like many colleges and universities, CSU offers some classes remotely. (*See* Deposition of Caryn Lanzo at 8, Doc. #25-1). Though it has increased during COVID-19, CSU's use of remote learning predates the pandemic. (*Compare* Second Amended Complaint at ¶ 12 *with* Answer at ¶ 12, Doc. # 146, 158). To facilitate online classes, in May 2016, CSU published written policies and procedures for them in a document called "Required Procedures & Recommended Practices to Address Security and Quality of eLearning Courses." (Dep. Lanzo at 11–14, Exh. 5). The policy document was the result of a joint effort between the Faculty Senate, the CSU Electronic Learning Committee, and CSU's Director of the Center for eLearning, Caryn Lanzo. (*Id.* at 13). The University developed it "following a review of the literature on best practices." (*Id.*, Exh. 5).

1

The Required Procedures "establish campus-wide guidelines on academic integrity and quality of eLearning courses…." (*Id.* at Exh. 5). To that end, it "outline[s] recommended practices for security and quality of online courses." (*Id.* at 11). Among these practices are the University's safeguards to prevent cheating on remote tests and make them "more secure." (*Id.* at 10, 14, 20–21). Although she says "there's probably not any way to ensure that students won't cheat," according to Director Lanzo, CSU's Required Procedures are effective in preserving test integrity. (*Id.* at 15–16).

At the start, the Required Procedures mandate that students taking online classes have a photograph in CSU's database so as "to eliminate impersonation and to ensure that the same student enrolled in the course is attending the online lectures and taking the exams." (*Id.*, Exh. 5 at 1). Though listed as a mandatory procedure, CSU "hasn't absolutely required" students to follow the photo ID policy. (*Id.* at 20). Lanzo describes it in practice as "more of a wish," saying it "isn't always necessarily the case" that CSU will have a student's photo ID on file. (*Id.* at 18–19); (Deposition of Hilda Zana at 15, Doc. # 24-1).

Photo identification notwithstanding, the University builds in other procedural safeguards to prevent cheating during online tests. For one thing, its Center for eLearning has written minimum standards on who may serve as a test proctor. (Dep. Lanzo at 24, Exh. 1); (Dep. Zana at 11). Those standards ensure not only that proctors have adequate qualifications but that they are not swayed by any possible conflicts of interest. (Dep. Lanzo at 26–27, Exh. 1). For another, the

2

Required Procedures identify practices faculty can use to prevent cheating, including: randomizing questions; using timed tests; and, requiring students to turn off cell phones and other communication devices. (*Id.*, Exh. 5 at 2).

CSU also uses technological safeguards. It offers faculty several computer programs for "enhanced online test security and proctoring." (*Id.*, Exh. 5 at 3). One of them is an online learning program called Blackboard, which has a plagiarism-detection feature. (*Id.* at 9). Blackboard has additional ways to detect cheating as well, including reports that allow faculty "to see more information about student activity, including the IP address where they logged in, [and] how much time they spent in the exam." (*Id.* at 58). Besides Blackboard, CSU uses various other programs created specifically for remote testing. The first of these is called the "Respondus LockDown Browser." (*Id.* at 37, 51). The LockDown Browser is just what it sounds like: a web browser that prevents students from searching the internet or using other computer programs during a remote test. (*Id.* at 51–52). It "locks the environment once the student opens that browser to take an exam so they can't navigate outside of that browser until they're done." (*Id.* at 67). Along with LockDown Browser, CSU uses a "companion product" called Respondus Monitor, which "creates a recording of the student taking the exam." (*Id.* at 67). It uses artificial intelligence and a student's webcam to detect suspicious movements, flagging them for an instructor to go back later and review. (*Id.* at 54). Director Lanzo says the LockDown Browser and Monitor are effective at preventing and detecting cheating. (*Id.* at 55). A similar program called Honolock is another tool

available to faculty. (*Id.* at 45). Like Monitor, it uses a student's webcam and artificial intelligence to detect cheating. (*Id.* at 45). Before starting an Honorlock test, students must first show their face for visual identification and a photo ID for comparison. (*Compare* Second Amended Complaint at ¶ 30 *with* Answer at ¶ 30).

Though *offering* all these safeguards, CSU does not actually *require* any of them. The University gives professors "a great deal of autonomy" how to conduct remote testing. (Dep. Lanzo at 15). It lets individual professors choose which of the available remote-proctoring tools to use and in which combination. (*Id.* at 22). For instance, a professor could opt for only the LockDown Browser or could use it in combination with Monitor. (*Id.* at 52). Or a professor could choose to use none of the remote-testing tools. (*Id.* at 41). For that matter, the University permits a professor to give "an online test *without being proctored at all.*" (*Id.* at 29) (emphasis added). As Director Lanzo puts it, it is a matter of "faculty discretion." (*Id.*).

B.    *CSU inconsistently employs a practice of preemptively searching student homes or bedrooms by video before proctoring some online tests.*

Regardless of which (or none) of these tools a professor opts to use, Director Lanzo explained CSU's standard practice before a remote test begins. Students first "need to show their ID" to the proctor. (*Id.* at 17); (Dep. Zana at 18). More than that, they must put it "next to their face so you can clearly see and read the ID and be able to tell that that person is the person that is on the ID." (Dep. Lanzo at 28). The proctor then tells students "to do a room scan of their environment." (*Id.* at 28). A room scan requires students to use their webcams "to show their surrounding and show a 360 view" of the room they are in. (*Id.* at 46); (Dep. Zana at 28). University

4

policy does not specify that students take an online test in a particular place but does require that it be "in an area where they can concentrate." (*Id.* at 23). CSU's website instructs students to "[e]nsure you're in a location where you won't be interrupted." (*Id.*, Exh. 2 at 3); (*compare* Second Amended Complaint at ¶ 53 *with* Answer at ¶ 53). "Most of the time" that will be the student's home; sometimes it is the student's bedroom. (Dep. Zana at 24). If there are other students taking the test at the same time, they can see the scan. (*Id.* at 29).

The room scan practice is not part of any written CSU policy. (Dep. Lanzo at 31). The Required Procedures neither suggest nor require one. (*Id.* at 23). Even so, Director Lanzo testified that a room scan is "required" on any recorded remote test. (Dep. Lanzo at 32). The University's Office of Testing Services similarly says that "[a]ll students, regardless of the course or instructor, are asked" to do a room scan before taking a remote test. (*See* Deposition of Aaron Ogletree, Exh. G). That in mind, CSU instructs its proctors to require one. (Dep. Zana at 23, 31). The proctor in this case assumes one is required unless a professor says otherwise. (*Id.* at 32).

One of the many students impacted by CSU's practice is Aaron Ogletree, a sophomore chemistry major. (Dep. Ogletree at 8). Before the start of the Spring 2021 Semester, he disputed a policy in the syllabus in his General Chemistry II class that "reserve[d] the right to ask any student, before, during, or after an exam to show their surroundings, screen, and/or work area." (*Compare* Second Amended Complaint at ¶ 49 *with* Answer at ¶ 49); (Dep. Ogletree at 14–15, Exh. C). The Professor removed the policy three days later. (*Compare* Second Amended

Complaint at ¶ 50 *with* Answer at ¶ 50). A month after that, Ogletree had a scheduled test in the class. About two hours before the start, CSU's Testing Services office emailed him with the exam instructions, which said he would be required to perform a room scan before taking the test after all. (Dep. Ogletree at 18, Exh. E).

Ogletree lives with his Mother and two siblings, all of whom were home at the time of the test. (*Id.* at 11–12). As a result, the only suitable space where he could take the test alone and uninterrupted was his bedroom. (*Id.* 11–12, 22). When the time came, the proctor required Ogletree to perform a room scan of his bedroom before starting the test. (Dep. Zana at 43). The recording maintained by CSU does not show the entire scan of his bedroom because the video switches over to the proctor's face halfway through. (*Id.* at 43–44). The scan lasted between 10 and 20 seconds. (*Id.* at 44); (Dep. Ogletree at 20). Though Ogletree has taken other remote tests at CSU, they did not all require a room scan. (*See* Dep. Ogletree at 8–9). In fact, "most of them had no proctoring" at all. (*Id.* at 9).

<u>SUMMARY OF THE ARGUMENT</u>

The question in this case is whether public officials may use webcams to preemptively search students' homes—or even bedrooms—without a warrant on the notion that any student *might* try to cheat on a remote test. The answer is no.

In *New Jersey v. TLO*, the Supreme Court laid out the "proper standard" for the constitutionality of searches by public-school officials for evidence of a rule violation. Though school officials need not obtain a warrant based on probable cause, they must meet a two-part showing. First, the search must be "justified at its inception." That means school officials must have *reasonable suspicion* the search

6

will uncover evidence that the student "has violated or is violating either the law or the rules of the school." Second, the search must also be *reasonable in scope*. CSU's practice of using students' webcams to preemptively search their homes before an online test must satisfy both prongs to be constitutional. It satisfies neither.

The searches are not justified at their inception because the University undertakes them without reasonable suspicion. When CSU conduct a room scan, it does so regardless of whether there is any reason to believe a particular student is cheating (or is about to cheat) on a remote test. That lack of reasonable suspicion alone renders the practice unconstitutional. Were it otherwise, the Fourth Amendment would afford lesser protection to students in the confines of their own homes than at their schools, where officials do need reasonable suspicion before searching students. The Fourth Amendment cannot abide that.

The room scan practice is also unreasonable in its scope. At the "very core" of the Fourth Amendment stands the home—the "first among equals." Peering into any student's home can reveal countless details about the student's personal life. Maybe it's the student's sexual preferences. Maybe it's the fact that they live in poverty. But whether salacious or mundane, inside the home "*all* details are intimate details." CSU cannot justify its intrusion upon that sacrosanct privacy interest. The University already has at its disposal a comprehensive series of procedural and technological safeguards to ensure remote-testing integrity. It admits these safeguards are effective. By contrast, if a room scan were truly critical, CSU would not have omitted it from its written online-learning policies, developed

7

after "review of the literature on best practices." Nor would it give faculty "a great deal of autonomy" in deciding whether to require one. Meanwhile, a room scan does nothing to stop the same tactics students use to cheat during an in-person test: a post-it note taped to a computer screen or a surreptitious trip to the bathroom to review stashed notes would circumvent the search with minimal effort. Neither necessary nor sufficient to achieve the aim of test integrity, the room scan practice is unreasonably intrusive.

The Fourth Amendment would never permit a school official to physically enter a student's home without a warrant and preemptively search for evidence the student might cheat on a test in the future. CSU's room scan practice is materially no different. It is the sort of unreasonable and "unrestrained intrusion[]" on student privacy the Supreme Court has warned against. Unless this Court creates a new exception for warrantless searches inside the home, the practice cannot stand.

### LAW AND ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, a court "should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). Once the movant satisfies the burden of production, the non-movant "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012).

I.    **CSU's unwritten practice of suspicionless video searches of student homes violates the Fourth Amendment.**

The Fourth Amendment (incorporated through the Fourteenth) applies to searches of public-school students by public-school officials. *New Jersey v. TLO*, 469 U.S. 325, 337 (1985); *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 632 (6th Cir. 2013). In *New Jersey v. TLO*, the Supreme Court addressed "the proper standard" for searches by public-school officials. *TLO*, 469 U.S. at 327. It held that, in keeping with other Fourth Amendment contexts, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id*. at 341. But unlike other Fourth Amendment contexts, it eschewed the need for a warrant issued upon a showing of probable cause. *Id*. at 340–41. The Court instead established a two-prong test for determining the constitutionality of a search by public-school officials:

> first, one must consider whether the ... action was *justified at its inception*; second, one must determine whether the search as actually conducted was *reasonably related in scope* to the circumstances which justified the interference in the first place.

*Id*. at 340–42 (emphasis added) (internal quotations and citations omitted); *G.C.*, 711 F.3d at 632. Consistent with the "underlying command of the Fourth Amendment" that searches and seizures must always be "reasonable," this two-part test represents a balance that "neither unduly burden[s] the efforts of school authorities to maintain order in their schools nor authorize[s] unrestrained intrusions upon the privacy of schoolchildren." *TLO*, 462 U.S. at 337, 342–43. It "remains the appropriate standard governing the search of an individual student based on a perceived rule violation." *Shade v. City of Farmington*, 309 F.3d 1054,

1060 (8th Cir. 2002). In this case, the *TLO* test compels the conclusion that CSU's unwritten practice of suspicionless video searches of student homes based only on a generalized fear of the possibility of cheating violates the Fourth Amendment.

A.  *Conducted without reasonable suspicion that a particular search will uncover evidence of a rule violation, CSU's room scan practice is not "justified at its inception."*

Under the first prong of *TLO*, a search is "'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *TLO*, 469 U.S. at 341–42; *G.C.*, 711 F.3d at 632; *Cummerlander v. Patriot Preparatory Acad., Inc.*, 86 F. Supp. 3d 808, 818 (S.D. Ohio 2015). In other words, school officials must meet "a standard of reasonable suspicion" before searching a member of the general student population. *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 370 (2009); *G.C.*, 711 F.3d at 633 (recognizing that a search "is justified at its inception" if based on "reasonable suspicion"); *accord Doe v. Little Rock Sch. Dist.*, 380 F.3d 349, 356 (8th Cir. 2004) ("[P]ublic schools have never been entitled to conduct random, full-scale searches of students' personal belongings because of a mere apprehension."); *Shade*, 309 F.3d at 1061; *R.D. v. Concord Community Sch.*, N.D. Ind. No. 3:19-CV-823-PPS, 2021 U.S. Dist. LEXIS 131963, at *9–10 (July 15, 2021); *Highhouse v. Wayne Highlands Sch. Dist.*, M.D. Pa. No. 3:16-cv-00078, 2018 U.S. Dist. LEXIS 162703, at *11 (Sep. 24, 2018); *Gray v. Great Valley Sch. Dist.*, 102 F. Supp. 3d 671, 685 (E.D. Pa. 2015); *Doe v. Champaign Community Unit 4 Sch. Dist.*, C.D. Ill. No. 11-3355, 2015 U.S. Dist. LEXIS 70075, at *14 (May 29, 2015); *S.S. v. Turner Unified Sch. Dist.*, D. Kan. No. 12-CV-02346-CM,

10

2012 U.S. Dist. LEXIS 177316, at *12 (Dec. 14, 2012); *Mendoza v. Klein Indep. Sch. Dist.*, S.D. Tex. Civil Action No. H-09-3895, 2011 U.S. Dist. LEXIS 166686, at *15 (Mar. 15, 2011). The Supreme Court describes that standard as a "moderate chance of finding evidence of wrongdoing." *Safford Unified Sch. Dist. #1*, 557 U.S. at 371; *Cummerlander*, 86 F. Supp. 3d at 819.[1]

The University's room scan practice does not meet the reasonable-suspicion threshold. CSU doesn't require a room scan only when it has a particular reason to suspect a particular student is cheating on a remote test. Instead, it asks "[a]ll students, regardless of the course or instructor" to do a room scan before taking a remote test. (*See* Dep. Ogletree at Exh. G). And the University instructs its proctors that a room scan is required as a default unless a teacher decides otherwise. (Dep. Zana at 31). The Director of the Center for eLearning confirms that a room scan is "required" on any recorded remote test. (Dep. Lanzo at 32). Missing from this practice though is the prerequisite of reasonable suspicion before demanding that students show their homes or bedrooms to University officials. In consequence, the room scans are not "justified at [their] inception."

---

[1] The Supreme Court's decisions involving warrantless drug tests of specific subsets of the student population does not suggest a contrary conclusion. Although the Supreme Court "has upheld suspicionless drug testing for students involved in both athletic and non-athletic extracurricular activities," it has not done so "for the entire student population." *Cummerlander*, 86 F. Supp. 3d at 819 (*citing Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) and *Bd. of Educ. of Indep. Sch. Dist. of Pottawatomie Cty. v. Earls*, 536 U.S. 822 (2002)). Nor has it done so outside the special context of drug testing. For other types of searches, the Court has required reasonable suspicion before searching members of the student body as a whole. *See Safford Unified Sch. Dist. #1*, 557 U.S. at 370.

The Sixth Circuit's analysis in *G.C. v. Owensboro Public Schools*, 711 F.3d at 623, is instructive on the point. There, the court held that a school official's search of a student's cell phone was not "justified at its inception" because the official had no "specific reason at the inception" of the search to believe the student "then was engaging" in any rule violation. *Id*. at 634. That was true although the school had "general background knowledge" of the student's past rule violations and drug abuse. *Id*. at 633–34. Here, CSU searches student homes and bedrooms without even that much. It conducts room scans as a general—if inconsistently applied— practice. The University does so regardless of whether there is any reason to suspect a given student is cheating, or might cheat, on a test. If the targeted search of a student known to be struggling required—and lacked—reasonable suspicion, the same must be true of CSU's default practice of searching bedrooms and homes before a test. The practice therefore violates the Fourth Amendment.

Precedent aside, common sense compels this conclusion. If a public school could conduct suspicionless searches of student homes, the Fourth Amendment would afford students lesser protection in the confines of their own bedrooms than in the cafeterias, corridors, and classrooms of the school itself. Even within school walls, the Fourth Amendment shields students from suspicionless searches for evidence of a rule violation not involving health or safety. Students must have *at least* that much protection when inside their own homes. A holding to the contrary cannot be squared with decades of Fourth Amendment jurisprudence recognizing the home as a sanctuary at the "very core" of the right. *See Silverman v. United*

12

*States*, 365 U.S. 505, 511 (1961). CSU's practice of permitting video searches of student homes without reasonable suspicion is not justified at its inception and cannot stand.

B.   *Requiring students to show their homes or bedrooms to school officials is unreasonably intrusive because it is neither necessary nor sufficient to detect and deter cheating on remote tests.*

CSU's room scan practice fails *TLO's* second prong as well. A search is "permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *TLO*, 469 U.S. at 342. This determination requires "balancing the scope and the manner in which the search is conducted in light of the students' reasonable expectations of privacy, the nature of the intrusion, and the severity of the school officials' need in enacting such policies." *Brannum v. Overton County Sch. Bd.*, 516 F.3d 489, 496 (6th Cir. 2008) (*citing Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005)). Put more plainly, "the means employed must be congruent to the end sought." *Brannum*, 516 F.3d at 497. In this case, the University's ends do not justify its means.

The starting point in the analysis is the privacy interests at stake. "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). At the Amendment's "'very core'" stands "'right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Id*. (*quoting Silverman*, 365 U.S. at 511). With that in mind, "[s]earches inside a home without a warrant are presumptively unreasonable." *United States v. Karo*, 468 U.S. 705, 715 (1984). "With few

13

exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). This case does not present one of those few and the Court should not create a new one.

The question here is whether public-school officials may commandeer a student's webcam to search the student's home, or even their bedroom, without a warrant, exigent circumstances, a concern for health and safety, or reasonable suspicion of a rule violation. It is a practice no different in kind from a school requiring a student to let the principal physically enter the home to look around before a test. There can be little question the Framers would have recoiled at the thought of a government official entering a citizen's bedroom to conduct such a preemptive search. The University's practice of doing so is unreasonable in scope and violates the Fourth Amendment.

Myriad real-life scenarios illustrate the depth of this intrusion. Consider for example the humiliation of a student living in poverty from being compelled to show his meager living conditions to both a school official and his classmates as a condition of taking a required test in a required course. Or consider a student whose wall décor or surroundings reveal a sexual orientation the student prefers not to publicly disclose. Perhaps most of all, consider one of the many sexual assault survivors attending colleges and universities across the country. It requires no legal analysis to understand the distress such a student would feel at the prospect of letting a stranger virtually enter her bedroom of all places. At any rate, a student's

14

particular personal details are beside the point. Where the home is concerned, "*all* details are intimate details, because the entire area is held safe from prying government eyes." *Kyllo*, 533 U.S. at 37 (emphasis in original). But the University's mandate that students take a remote test somewhere they "won't be interrupted," (*see* Dep. Lanzo, Exh. 2 at 3), leaves many no real option except to open their homes and bedrooms to the prying eyes of school officials.

Though it must be conceded that any school has a general interest in deterring and detecting cheating, that interest does not bestow authority to violate the Constitution. CSU's practice is neither necessary nor sufficient to achieve its stated goal. Especially when measured against the privacy interests at stake, it is unreasonable.

1. <u>A room scan is not necessary to preserve test integrity</u>.

Based on the University's own admissions and written policies, preemptively searching a student's home before a test is not necessary to prevent cheating.

As an initial matter, the University itself doesn't always require a room scan. Following "a review of the literature on best practices," CSU published written "campus-wide guidelines on academic integrity" designed to ensure the integrity of remote exams and to "make the exam more secure." (Dep. Lanzo at 10, 14, 20–21, Exh. 5). In other words, to prevent cheating. (*Id*. at 21). Yet the written policy does not require or suggest using a room scan. (*Id*. at 23). According to CSU's Director of the Center for eLearning, the policy has been effective all the same. (*Id*. at 15–16). The University instead leaves the choice to individual faculty. It grants professors "a great deal of autonomy" how to conduct remote testing. (*Id*. at 15). Indeed, CSU

15

allows professors to give "an online test without being proctored at all." (*Id*. at 29). Were searching a student's room so indispensable to remote-test integrity, CSU would not have omitted it from the written policy it developed through the joint effort of faculty and administration. (*See id*. at 13). Nor would it permit such wide "faculty discretion" to decide whether a room scan is necessary. (*Id*. at 29). This otherwise-lax attitude belies the claim that even the University truly believes a room scan is vital for test integrity.

By contrast, CSU has at its disposal an interlocking series of procedural safeguards against cheating. It enforces standards for who may proctor a test, ensuring adequate training and preventing conflicts of interest. (*Id*. at 24, Exh. 1). Before a test starts, CSU requires students to show photo ID so as "to eliminate impersonation and to ensure that the same student enrolled in the course is attending the online lectures and taking the exams." (*Id*. at 17, Exh. 5 at 1); (Dep. Zana at 18). And of course, there are the proctors themselves. They watch students during the entire exam, checking for suspicious "eye movement" or "body language," just one would during an in-person exam. (Dep. Zana at 44, 49).

Stacked on top of these procedural safeguards are technological ones. The University has several online proctoring programs available, each offering "enhanced online test security and proctoring." (Dep. Lanzo, Exh. 5 at 3). Blackboard detects plagiarism and allows faculty to check student IP addresses and time spent on a test. (*Id*. at 9, 58). LockDown Browser prevents students from either searching the internet or using other computer programs during an online

16

test. (*Id*. at 51–52, 67). Its "companion product," Respondus Monitor, records students during exams and uses artificial intelligence to detect any suspicious movements, flagging them for review. (*Id*. at 51, 67). Honorlock does the same, recording students and using artificial intelligence as a means of test security. (*Id*. at 45). CSU admits the proctoring tools it uses are effective at preventing cheating. (*Id*. at 55).

Whether used alone or in combination, these safeguards preserve test integrity. That is why CSU put them in its written policy. And none of them are as intrusive as preemptively searching a student's room before a test.

At the same time, the University doesn't consistently enforce all the basic written safeguards it does have. CSU "hasn't absolutely required" students to put a photo ID on file with the school. (Dep. Lanzo at 20). Despite listing it as a "required" procedure to prevent cheating, CSU treats it in practice as "more of a wish." (*Id*. at 18–19); (Dep. Zana at 15). To say academic integrity demands intruding into students' homes when the University fails to follow its own most basic—and less-intrusive—testing policies is inconsistent with the Fourth Amendment's "underlying command" that searches always be "reasonable." *TLO*, 462 U.S. at 337. For that reason alone, the room scans are excessively intrusive.

2.    <u>A room scan is not sufficient to preserve test integrity</u>.

Not only is a room scan unnecessary, it is also of minimal value in the effort to prevent cheating. Forcing students to show their rooms to a school official before starting a remote test does nothing to detect or deter the same sorts of tactics students use to cheat in-person. Though she has not caught anyone cheating by

using a room scan, the proctor in this case has caught a handful during in-person exams. (Dep. Zana at 33). The most typical method is "trying to sneak in cell phones." (*Id*.). She has also caught students bringing in paper materials they were not allowed to have. (*Id*. at 33–34). One student had a "tiny little," "itty bitty" cheat sheet. (*Id*. at 34). Another hid notes in the bathroom, "and then they have to go to the bathroom a whole lot." (*Id*. at 34). A room scan wouldn't catch students using identical tactics. It does nothing to stop a student from going to the bathroom where she has stashed a cell phone or notes, safe in the knowledge that nobody will steal them from her own home. (*Cf. id*. at 35) ("Q. And during a remote exam students are not allowed to leave the camera view, correct? A. Well, if they have to use the bathroom I can't stop them . . . I would allow them of course."). Nor would a room scan catch a student who taped a post-it note to his computer screen. (*Id*. at 59). As CSU acknowledges, there is no foolproof way to prevent cheating. (*Id*. at 58); (Dep. Lanzo at 64). But weighed against the intrusion it imposes, a suspicionless search of a student's home before a remote test is of comparatively minimal value. That renders the room scan practice unreasonable under the Fourth Amendment.

It matters not that the search takes under a minute. "The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained." *Kyllo*, 533 U.S. at 37. Where an unreasonable search and the home intersect "'even a fraction of an inch'" is too much. *Id*. (*quoting Silverman*, 365 U.S. at 512); *Smyth v. Lubbers*, 398 F. Supp. 777,

789 (W.D. Mich. 1975) (recognizing that the Fourth Amendment is "flexible enough to meet a variety of public needs, but it will not admit of slight infringements").

The University's unwritten and inconsistently applied room scan practice is not "reasonably related in scope" to its stated aims. It is unconstitutional.

## CONCLUSION

For the reasons stated above, the Court should grant summary judgment in Plaintiff's favor.

Respectfully submitted,

 /s/ Matthew D. Besser
Matthew D. Besser (0078071)
Cathleen M. Bolek (0059884)
**BOLEK BESSER GLESIUS LLC**
Monarch Centre, Suite 302
5885 Landerbrook Drive
Cleveland, Ohio 44124
T 216.464.3004
F 866.542.0743
cbolek@bolekbesser.com
mbesser@bolekbesser.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that: a copy of the foregoing was filed this 15th day of November, 2021; this case is assigned to the standard track; and, this motion is within the page limits of Local Rule 7.1(f). Notice of the foregoing will be served by operation of the Court's electronic filing system upon:

Todd R. Marti
Ashley A. Barbone

*Counsel for Defendants*

 /s/ Matthew D. Besser
*Counsel for Plaintiff*

19