# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| AARON M. OGLETREE, | ) | Case No. 1:21-cv-00500 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | |
| | ) | |
| CLEVELAND STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AMENDED OPINION AND ORDER

Even before the Covid-19 pandemic, Cleveland State University offered courses online and used various methods to ensure the integrity of remote tests. One method involves using a student's camera briefly to scan the test taker's surroundings for potential impermissible study aids or notes. Plaintiff Aaron Ogletree, a student at Cleveland State University, filed suit alleging that this practice or policy violated his rights when a proctor asked him to conduct a room scan of his bedroom before starting a remote test.

Plaintiff and Defendant each move for summary judgment. For the following reasons, the Court **DENIES** Defendant's motion for summary judgment (ECF No. 29) and **GRANTS** Plaintiff's motion (ECF No. 30). In this Amended Opinion and Order, the Court also addresses Plaintiff's motion for a permanent injunction (ECF No. 41) and incorporates the clarifications referenced in its Opinion and Order (*see* ECF No. 49) on Defendant's motion for reconsideration (ECF No. 42).

## STATEMENT OF FACTS

This case arises out of a scan Cleveland State University conducted of a student's bedroom in connection with a remote test Mr. Ogletree took for one of his classes.  The record contains the following facts, which are largely undisputed.

### A.    Cleveland State's Remote Testing Policies

Cleveland State University offers some classes remotely.  (ECF No. 17, ¶ 11, PageID #146; ECF No. 19, ¶ 11, PageID #160.)   In May 2016, Cleveland State published campus-wide guidelines for online classes in a document titled "Required Procedures & Recommended Practices to Address Security and Quality of eLearning Courses."  (ECF No. 25-2, PageID #330.)  One of the purposes of the document was to ensure the integrity of remote tests.  (ECF No. 25-1, PageID #268.)

A required procedure mandates that students taking online classes have a photograph in Cleveland State's database at the time of registration so as "to eliminate impersonation and to ensure that the same student enrolled in the course is attending the online lectures and taking the exams."  (ECF No. 25-1, PageID #273–74; ECF No. 25-2, PageID #330.)  However, Cleveland State does not enforce this procedure, and some students taking online classes do not have a photograph in the database.  (ECF No. 25-1, PageID #272–74.)

In addition to required procedures, the University's recommended practices leave testing "to the faculty member's discretion to implement."  (ECF No. 25-2, PageID #331.)   Some recommended practices include randomizing the order of

questions, using timed tests, and using remote proctoring tools.  (*Id.*, PageID #331–32.)

As remote proctoring tools, Cleveland State offers several programs designed to enhance "online test security and proctoring."  (*Id.*, PageID #332.)  For instance, Cleveland State's learning management system, Blackboard, offers a plagiarism detection system and generates reports "that faculty can use to see more information about student activity, including the IP address from where they logged in, how much time they spent in the exam."  (ECF No. 25-1, PageID #262–63 & 312.)  Cleveland State also uses the proctoring tools Respondus and Honorlock.  (*Id.*, PageID #291.)  For Respondus, Respondus LockDown Browser prevents students from accessing the internet or using other computer programs during a remote test, while Respondus Monitor records the student taking the exam and uses artificial intelligence to flag suspicious activity.  (*Id.*, PageID #305–06 & 321.)  Similarly, Honorlock uses a student's camera and artificial intelligence monitoring.  (*Id.*, PageID #299.)  Among these remote proctoring tools, faculty members have discretion to choose which tool or combination of tools, if any, are necessary to preserve the integrity of the remote exam.  (*Id.*, PageID #275–76 & 295.)

## B.   Cleveland State's Use of Room Scans

Cleveland State neither requires nor recommends the use of a room scan pursuant to any written policy.  (ECF No. 25-1, PageID #277.)  In a non-proctored exam, there is no room scan.  (*Id.*, PageID #283.)  However, each of the online proctoring tools that Cleveland State uses, Respondus and Honorlock, requires a

room scan as part of its prerecorded instructions.  (*Id.*, PageID #291–93.)  For in-person proctored exams, the test coordinator at Cleveland State University Testing Services informed Mr. Ogletree by email that it has a process of performing a "cursory review of [the student's] immediate testing space," and "[a]ll students, regardless of the course or instructor, are asked to do this as part of the check-in process."  ([ECF No. 26-7](), PageID #413.)

When a student takes an online exam, it proceeds as follows.  First, at the outset of a proctored online exam, whether proctored through an electronic application or an actual person, students must "show their ID next to their face so you can clearly see and read the ID and be able to tell that that person is the same person that is on the ID."  ([ECF No. 25-1](), PageID #282; [ECF No. 24-1](), PageID #202.)  Second, either the proctoring application or the proctor prompts the student to conduct a room scan of his environment.  ([ECF No. 25-1](), PageID #282; [ECF No. 24]()-1, PageID #211.)  Other students taking the remote test can see the room scans of other students.  ([ECF No. 24-1](), PageID #212.)

The proctor who performed the room scan at issue in this case testified that her supervisor, the Cleveland State Testing Services' test coordinator, instructed her to perform the room scan.  ([ECF No. 24-1](), PageID #214.)  Further, the proctor presumed that a room scan was required unless the professor in the class instructed otherwise.  (*Id.*, PageID #215.)  As to whether students may refuse to conduct the room scan, the proctor testified that she never had a student refuse, and she was not aware of a Cleveland State policy addressing how to handle a student's refusal.  (*Id.*,

PageID #213.) The proctor testified that in the event of a refusal, she would allow the student to take the test but notify the professor that the student refused to perform the room scan. (*Id.*)

### C. Mr. Ogletree's Enrollment at Cleveland State

At the time of the events relevant to this action, Mr. Ogletree studied chemistry at Cleveland State University. (ECF No. 26-1, PageID #352.) For the spring 2021 semester, Mr. Ogletree enrolled in five classes. (ECF No. 17, ¶ 39, PageID #149–50.) Due to the Covid-19 pandemic, most Cleveland State classes during the spring 2021 semester were conducted remotely. (ECF No. 1, ¶ 40, PageID #150; ECF No. 19, ¶ 40, PageID #163.)

In the complaint, Plaintiff alleges that during the spring 2021 semester, Cleveland State required students to complete and pass a "Daily Health Assessment" to attend a class in-person on campus. (ECF No. 17, ¶ 42, PageID #150.) Attending classes in person was not an option for him, Plaintiff says, because of "various health issues that impact his immune system and put him at particular risk to the COVID pandemic." (*Id.*, ¶ 45, PageID #150.) Further, "[b]ecause of his health issues, Ogletree does not pass the Daily Health Assessment"; therefore, according to the complaint, Cleveland State would not permit him to take his tests in-person on campus. (*Id.*, ¶¶ 46 & 47, PageID #150.) Plaintiff also alleged he has "family members who are at high-risk to the pandemic." (*Id.*, ¶ 48, PageID #150.)

**D.     The Room Scan**

In January 2021, Mr. Ogletree disputed a policy contained in the syllabus for his General Chemistry II class.  (ECF No. 17, ¶ 49, PageID #151; ECF No. 19, ¶ 49, PageID #164.)  The policy stated:  "The proctors and I reserve the right to ask any student, before, during, or after an exam to show their surroundings, screen, and/or work area.  We will send you a private chat to ask you to do this.  If you do not see the chat message, I will use the microphone to ask you to check the chat." (*Id*.)  Three days later, the Professor removed the policy from the syllabus.  (ECF No. 17, ¶ 50, PageID #151; ECF No. 19, ¶ 50, PageID #164.)

On February 17, 2021, Mr. Ogletree had a General Chemistry II remote test scheduled for 12:30 pm.  (ECF No. 17, ¶ 51, PageID #151; ECF No. 19, ¶ 51, PageID #164.)  At the time, Mr. Ogletree lived with his mother and two siblings, who were all home when Mr. Ogletree took the chemistry exam.  (ECF No. 26-1, PageID #354–55.)  Cleveland State requires students to take remote tests in a location where they will be alone and uninterrupted.  (ECF No. 17, PageID #151; ECF No. 19, PageID #165.)  Mr. Ogletree testified that his bedroom was the only suitable testing environment.  (ECF No. 26-1, PageID #366.)

That morning, at 10:25 am, almost two hours before the scheduled exam, Cleveland State Testing Services emailed Mr. Ogletree to inform him that the proctor would be "checking your ID, your surroundings and your materials."  (ECF No. 26-5, PageID #409.)  At 10:40 am, Mr. Ogletree replied to the email.  (*Id*.)  Mr. Ogletree explained that he "currently [had] confidential settlement documents in the form of

late arriving 1099s scattered about [his] work area and there is not enough time to secure them." (*Id.*)

At the start of the exam, the proctor asked Mr. Ogletree to perform a room scan of his bedroom, and Mr. Ogletree complied. (ECF No. 24-1, PageID #226.) The scan lasted less than a minute, and as little as ten to twenty seconds. (*Id.*, PageID #227; ECF No. 26-1, PageID #368.) The proctor testified that she did not see any tax documents or medications. (ECF No. 24-1, PageID #239–40.)

The room scan and the test were recorded, and the video recording was retained by Cleveland State's third-party vendor. (ECF No. 25-1, PageID #301.) Cleveland State is not aware of any data breaches related to remote exam recordings, and access to the video is strictly controlled. (ECF No. 25-1, PageID #301; ECF No. 24-1, PageID #236–37.)

## STATEMENT OF THE CASE

Based on these facts, Plaintiff alleges that Defendant violated his rights under the Fourth Amendment and seeks injunctive and declaratory relief. (ECF No. 17, PageID #152–53.) Both Plaintiff and Defendant move for summary judgment. (ECF Nos. 29 & 30.)

## ANALYSIS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must view evidence in

the light most favorable to the non-moving party.  *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Ultimately, the Court must determine whether "one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

## I.    Fourth Amendment Searches

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV; *United States v. Jones*, 565 U.S. 400, 404 (2012).  Plaintiff contends that Cleveland State's policy of conducting warrantless room scans of students' homes violates the Fourth Amendment's prohibition against unreasonable searches as it applies to the State of Ohio through the Fourteenth Amendment. (ECF No. 17, PageID #153.)

At the outset, the parties contest whether the remote virtual room scans at issue qualify as searches within the meaning of the Fourth Amendment.  Specifically, they debate whether the Fourth Amendment applies under *Wyman v. James*, 400 U.S. 309 (1971), and its progeny.

### I.A.    General Principles

A Fourth Amendment search "occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)).  Even in the expressly protected location of a house, which receives

8

heightened protection under the Fourth Amendment, a search within the meaning of the Constitution does not occur unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and society is "willing to recognize that expectation as reasonable." *Id.* (citing *California v. Ciraolo*, 47 U.S. 207, 211 (1986)).

Plaintiff contends that the remote room scans at issue are Fourth Amendment searches because students have a subjective expectation of privacy in their houses, and especially in their bedrooms, and society recognizes that expectation as reasonable. (ECF No. 33, PageID #499.)  In response, Defendant maintains that Plaintiff's subjective expectation of privacy was not objectively reasonable. (ECF No. 34, PageID #512.)  Defendant points to evidence showing that room scans are "standard industry wide practice" and that students frequently acquiesce in their use. (ECF No. 34, PageID #512–14.)

Although the record shows that no student, other than Mr. Ogletree, ever objected to the scans (ECF No. 24-1, PageID #213), the facts also implicate the core places where society, to the extent it can agree on much these days, recognizes reasonable and legitimate privacy interests—namely, the home.  Though schools may routinely employ remote technology to peer into houses without objection from some, most, or nearly all students, it does not follow that others might not object to the virtual intrusion into their homes or that the routine use of a practice such as room scans does not violate a privacy interest that society recognizes as reasonable, both factually and legally.  Therefore, the Court determines that Mr. Ogletree's subjective

expectation of privacy at issue is one that society views as reasonable and that lies at the core of the Fourth Amendment's protections against governmental intrusion.

To support the argument that the expectation of privacy Plaintiff claims is objectively unreasonable, Defendant relies on several cases. First, Defendant argues that the room scans are not searches because they are routine. For this proposition, Defendant cites *California v. Ciraolo*, 476 U.S. 207, 215 (1986), in which the Supreme Court held that it was unreasonable to expect that marijuana plants were constitutionally protected from being observed from an altitude of 1,000 feet "in an age where private and commercial flight in the public airways is routine." *See also Florida v. Riley*, 488 U.S. 445, 449–50 (1989) (same). In *Ciraolo* and *Riley*, due to modern flight technology and its routine use, the marijuana plants were openly observable. These cases build on the traditional notion that governmental officials, lawfully in a public place, do not conduct unlawful searches simply by observing things in plain view. But the room scans peer behind walls and make visible places outside the ambit of cases such as *Ciraolo* and *Riley*. Rooms scans go where people otherwise would not, at least not without a warrant or an invitation.

Nor does it follow that room scans are not searches because the technology is "in general public use." Defendant cites *Kyllo*, 533 U.S. at 34–40, in which the Supreme Court held that law enforcement's use of thermal imaging technology not "in general public use" to explore the interior of the home constituted a Fourth Amendment search. But the Supreme Court did not hold the inverse—that the use of a technology "in general public use" could not be a Fourth Amendment search. To

the contrary, *Katz* held, as relevant here, that the procedural antecedents to a search that the Constitution requires apply even where new technologies make accessible places and information not otherwise obtainable without a physical intrusion.  389 U.S. at 359.  While cameras might be generally available and now commonly used, members of the public cannot use them to see into an office, house, or other place not publicly visible without the owner's consent.

Finally, Defendant cites *City of Ontario, California v. Quon*, 560 U.S. 746 (2010), in which the Supreme Court considered the privacy expectations of governmental employees in communications made on electronic equipment that the employer owns.   There, the Court observed that rapid changes related to communications were evident in both the technology and "what society accepts as proper behavior" and noted that the "operational realities of the workplace" might bear on the reasonableness of an employee's expectation of privacy.  *Id.* at 756–59. But *Quon* arose within the particular context of the employment relationship. Although the truism that technological change affects the degree of privacy that society accepts as reasonable has broader application, *Quon* and the cases that followed it have not extended this principle beyond the employment context.  Any decision to do so properly lies with another court, particularly if doing so pares back constitutional protections across different areas of the law.

Following *Katz*, Fourth Amendment jurisprudence examines an individual's expectation of privacy in a particular place.  The ubiquity of a particular technology or its applications does not directly bear on that analysis.  Here, the room scan

occurred in Plaintiff's house—in his bedroom, in fact. At the Fourth Amendment's "very core" lies "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citing *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Consistent with established precedent, the Court determines that Plaintiff had an objectively reasonable expectation of privacy in his home—and one that society recognizes as reasonable.

### I.B. Searches Under *Wyman v. James*

Additionally, Defendant contends that the room scans are not "searches" because they are limited in scope, conducted for a regulatory or administrative purpose, and not coerced. (ECF No. 29, PageID #462–66.) In support of the proposition that these attributes remove the room scans from the ambit of the Fourth Amendment, Defendant relies on *Wyman v. James*, 400 U.S. 309 (1971), and its progeny.

In *Wyman*, the Supreme Court considered whether a welfare beneficiary may refuse a home visit by her caseworker without risking the termination of benefits. 400 U.S. at 310. The *Wyman* Court specifically considered the heightened protection the Fourth Amendment affords to the privacy of the home and noted that "one's Fourth Amendment protection subsists apart from his being suspected of criminal behavior." *Id.* at 316 (citing *Camara v. Municipal Ct.*, 387 U.S. 523, 528–30 (1967)). Nonetheless, the Court held that this "protective attitude" in the law was not a factor in the case because the home visit was not a search in the Fourth Amendment sense.

12

*Id.* at 318.  Though State law made the visit mandatory for continuing benefits and the visit served both rehabilitative and investigative purposes, the Court concluded that the visit could not be equated with a search in the traditional criminal law context.  *Id.*  Indeed, the visit was not forced or compelled, the beneficiary's denial of permission was not a criminal act, and if the beneficiary did not consent then the visitation did not occur and the aid "merely cease[d]."  *Id.*

The other cases Defendant cites stem from *Wyman*.  In *S.L. v. Whitburn*, 67 F.3d 1299, 1307 (7th Cir. 1995), and *Sanchez v. City of San Diego*, 464 F.3d 916, 920–23 (9th Cir. 2006), the Seventh and Ninth Circuits noted that they were bound by *Wyman* and held that home visits made pursuant to the administration of welfare benefits were not searches under the Fourth Amendment.  *See also Schmid v. City of Sonoma*, No. 19-cv-00883, 2021 WL 1118077, at *4 (N.D. Cal. Mar. 24, 2021) (upholding denial of an exemption for refusal to consent to a permit-related inspection on the grounds that the inspections were not Fourth Amendment searches under *Wyman*).  Similarly, in *Marcavage v. Borough of Lansdowne, Pennsylvania*, 493 F. App'x 301 (3d Cir. 2012), the court upheld an ordinance authorizing denial of a rental license if the property owner refused to consent to an inspection.  The Third Circuit reasoned that the ordinance "requires a limited search by the city official for the specific purpose of receiving a benefit under the law," which is constitutional under *Wyman*.  *Id.* at 306.

Based on *Wyman*'s differentiation between investigations and Fourth Amendment searches, Defendant advances several reasons why its room scans of

students' homes are not searches.  First, Defendant conducted the scan for the regulatory purpose of protecting exam integrity, not for any purpose related to criminality.  (ECF No. 29, PageID #463.)  Second, the scan was not coerced because Plaintiff was free to object to the scan or refuse to perform it.  (*Id.*)  A student who refused to conduct the exam could still take the test and, even if failure to conduct the scan resulted in not getting credit for the exam, that consequence is less severe than the loss of welfare benefits in *Wyman*.  (*Id.*, PageID #464–65.)  Third, the scan was limited in scope because it was brief, only revealed items in plain view, and the student controlled the inspection to the extent that the student chose where in the house to take the exam and where in the room to direct the camera during the scan.  (*Id.*, PageID #463–64.)  Defendant argues that the room scan was less intrusive than the home visits in *Wyman* because no State officer physically entered Plaintiff's home, Defendant told Plaintiff of the scan two hours in advance, and Plaintiff could choose the part of the home to be inspected and remove any private matters from plain view.  (*Id.*, PageID #464.)

Plaintiff responds that Defendant overreads *Wyman*.  (ECF No. 33, PageID #500.)  Plaintiff points to the Sixth Circuit's holding in *Andrews v. Hickman County, Tennessee*, 700 F.3d 845 (6th Cir. 2012).  There, the court considered whether social workers who conducted a warrantless home visit in a child abuse investigation were entitled to qualified immunity.  The Sixth Circuit noted that the Fourth Amendment's restrictions on unreasonable searches extended to the "activities of civil as well as criminal authorities."  *Id.* at 858–59 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 335

14

(1985)).  Describing case law from other circuits, the court referenced a case in which the Ninth Circuit declined to exempt social workers investigating allegations of child abuse from the Fourth Amendment by distinguishing *Wyman* as making "receipt of a requested welfare benefit contingent on the grant of entry for a search intended to confirm that the monies were being used in the recipient child's interest, where the entry under the state program was of a limited and consensual nature, and the requirement applied to all recipients."  *Id.* at 859 (citing *Calabretta v. Floyd*, 189 F.3d 808, 816 (9th Cir. 1999)).  "Given the presumption that state actors are governed by the Fourth Amendment and the sanctity of the home under the Fourth Amendment," the Sixth Circuit held that social workers were governed by the Fourth Amendment's warrant requirement.  700 F.3d at 859.

Plaintiff argues that *Andrews* shows that *Wyman* did not create a Fourth Amendment exception for civil authorities.  (ECF No. 33, PageID #501.)  Rather, longstanding precedent establishes that the Fourth Amendment applies to searches conducted for noncriminal purposes, especially in the home.  (ECF No. 33, PageID #501–02.)  Further, Plaintiff maintains that it is well established that the Fourth Amendment applies to all intrusions into a private home, however limited.  (*Id.*, PageID #502–03.)  Defendant does not dispute that the Fourth Amendment gives heightened protection to the home or that the Fourth Amendment applies in noncriminal matters.  (ECF No. 35, PageID #533.)  However, Defendant argues that the *Wyman* Court considered both of those points and, nonetheless, determined that no Fourth Amendment search occurred.  (*Id.*)

15

*Wyman* dates to 1971, more than fifty years ago. Since then, society, technology, and Fourth Amendment jurisprudence have changed markedly. In the cases applying *Wyman* on which Defendant relies, courts applied *Wyman* in the context of upholding termination or denial of a benefit following the beneficiary's refusal to consent to an inspection, where refusal triggered no penalties except the termination or denial of benefits. In this respect, the Sixth Circuit's decision in *Andrews*, quoting *Calabretta* from the Ninth Circuit, accurately reads this line of cases as applying to a fairly distinct set of circumstances materially different from those at issue here: making welfare benefits contingent, for all recipients, on a limited and consensual search to confirm expenditure of the funds for the interest of a child. In contrast, unlike *Wyman* and its progeny, this case involves the privilege of college admission and attendance and does not involve a benefit made available to all citizens as of right. Additionally, the record here shows a variable policy—enforced, unevenly, in the discretion of a combination of proctors and professors—of using remote scans that make a student's home visible, including to other students, with uncertain consequences.

Finally, the Court addresses Plaintiff's argument that *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), provides the proper standard for the constitutionality of searches that school officials conduct. (ECF No. 33, PageID #503.) In *T.L.O.*, the Supreme Court held that the Fourth Amendment applies to searches by school officials, with some accommodation to respond to the needs of the educational environment and assess the legality of those searches. *Id.* at 341–42. But *T.L.O.* does not speak to the

16

threshold question of when a school official's actions constitute a search within the meaning of the Fourth Amendment.  Accordingly, the Court need not address *T.L.O.* on this question.

*     *     *

For these reasons, the Court concludes that the Fourth Amendment applies to the virtual room scans Cleveland State uses.  Holding otherwise, as Defendant argues, raises even more difficult questions about what legal standard, if any, governs the scans and the potential consequences of such a ruling in other areas of life and the law that technology touches.

## II.    Fourth Amendment Reasonableness

The Fourth Amendment proscribes only those searches that are unreasonable. Having held that the room scans are searches for purposes of the Fourth Amendment, the Court turns to whether the scans are reasonable.  Whether a particular search meets the reasonableness standard "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  *Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)).  Although the Fourth Amendment mandates that no warrant may issue except on a showing of probable cause, that requirement is not absolute.  A warrant is not required in every case. *National Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989).  As the text of the Fourth Amendment makes clear, the Constitution protects against *unreasonable* searches and seizures, making reasonableness the ultimate touchstone

17

of the analysis—at least in a case like this one where there was no clear practice at the time of ratification. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995).

In the context of a criminal investigation, reasonableness generally requires a warrant, which requires probable cause. *Skinner*, 489 U.S. at 619–20; *Von Raab*, 489 U.S. at 665. However, probable cause is not required in every circumstance. *See, e.g.*, *Von Raab*, 489 U.S. at 665. Plaintiff asserts that *T.L.O.* supplies the applicable standard for determining reasonableness. (ECF No. 30, PageID #484–94.) But *T.L.O.* provides the test for determining the constitutionality of a search by a public-school official based on the official's suspicion that a student broke the law or a school rule. *See T.L.O.*, 469 U.S. at 345–47. The room scans at issue are not based on suspicion of any particular student. But individualized suspicion is not always required either. *Skinner*, 489 U.S. at 618–24. Accordingly, Plaintiff's reliance on *T.L.O.* is misplaced.

Although the Fourth Amendment generally prohibits suspicionless searches, an exception exists in certain circumstances where the government has "special needs, beyond the normal need for law enforcement." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *T.L.O.*, 469 U.S. at 351). Where a governmental intrusion serves "special needs," courts must balance the individual's privacy expectations against the State's interests to assess a search's reasonableness and the practicality of the warrant and probable-cause requirements in the particular context. *Skinner*, 489 U.S. at 619–20. "A search unsupported by probable cause can be constitutional . . . 'when special needs, beyond the normal need for law enforcement, make the

18

warrant and probable-cause requirement impracticable.'" *Vernonia Sch. Dist. 47J*, 515 U.S. at 653 (quoting *Griffin*, 483 U.S. at 873).  To determine whether the special needs exception applies, courts consider:  (1) the nature of the privacy interest affected; (2) the character of the intrusion; (3) the nature and immediacy of the government concern; and (4) the efficacy of this means of addressing the concern.  *Id.* at 654–64.  On the facts and circumstances presented, the Court determines that the special-needs analysis provides the appropriate framework for analyzing the search at issue.

### II.A.  Nature of the Privacy Interest Affected

As to the nature of Mr. Ogletree's privacy interest at stake, it is well settled that the home lies at the core of the Fourth Amendment's protections, as noted above. Though the intrusion in this case was not physical, the same principles protecting the sanctity of the home apply to a visual intrusion conducted through remote technology.  *See Kyllo*, 533 U.S. at 34 (analyzing thermal imaging of a home under Fourth Amendment principles).

In arguing that the room scan is less intrusive on Plaintiff's privacy interest than other searches found reasonable, Defendant relies in part on *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822 (2002) (upholding suspicionless drug testing).  (ECF No. 29, PageID #468.)  However, the *Earls* Court relied on a line of cases arising within the context of public elementary and secondary schools, noting that "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children."  *Id.* at

829–30 (citing *Vernonia Sch. Dist. 47J*, 515 U.S. at 656). In this context, reasonableness under the Fourth Amendment is informed by the status of students as "unemancipated minors" who "have been committed to the temporary custody of the State as schoolmaster." *Id.* at 654. In short, under this line of cases, minor students subject to compulsory school attendance have a lesser privacy interest.

In contrast, Mr. Ogletree was an adult at the time of the search at issue and enrolled at Cleveland State by choice. Although this setting might affect the nature of the privacy interest at stake to some degree, it is difficult to see how enrollment in a higher educational institution would limit the core protections of the home under the Fourth Amendment on the facts and circumstances of this case.

### II.B.   Character of the Intrusion

On the record presented, this analysis encompasses several considerations. First, by enrolling in classes at Cleveland State, Mr. Ogletree necessarily traded away some privacy for the privilege and for other goods, such as the opportunity to earn educational credentials or to interact with other students or faculty. Of course, he retained his constitutional rights. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). In normal times, a student might be able to choose another college or among classes with different options for tests and assessments. A student who valued privacy more might opt for courses with in-person tests, while another who prefers convenience might tolerate an intrusion of the sort at issue here. Cleveland State's policies and practices make such choices and tradeoffs opaque, at best. Faculty members have discretion on how to implement remote testing.

Because of the pandemic, such choices were more limited for Mr. Ogletree. Plaintiff alleges that he did not have the option of attending in-person classes at the time of the room scan because of health concerns.  In other words, enrollment in online courses allowed Mr. Ogletree to continue to pursue his education at Cleveland State while taking the steps he subjectively thought appropriate or necessary based on his personal health risks.  Moreover, in Mr. Ogletree's case, the record shows that the professor changed the policy shortly after the start of the course.  As a result, Plaintiff reasonably believed he would not be subject to a room scan until approximately two hours before the time of his test.

But the room scan at issue was minimally intrusive.  It is undisputed that the scan occurred over an exceedingly short period of time, and Plaintiff had discretion over where to direct the camera in his room, as well as some warning to take steps to protect his privacy and ensure that the confidential materials he had were not readily in view.  On the other hand, other students can see the room scans.  Further, the "Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained." *Kyllo*, 533 U.S. at 35.  Although the intrusion at issue might not strike a person as especially problematic, particularly in the nascent Zoom era, the core protection afforded to the home, the limited options, inconsistency in application of the policy, and short notice of the scan weigh in Plaintiff's favor.  "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of

procedure." *Silverman*, 365 U.S. at 512 (quoting *Boyd v. United States*, 116 U.S. 616, 635 (1886)).

## II.C.  Governmental Interests

Defendant argues that the room scams facilitate proctoring of tests and ensure academic fairness and integrity.  (ECF No. 29, PageID #467.)  These practices help detect other people or unauthorized study aids present in the room which might improperly assist the examinee and deter examinees from availing themselves of these and other forms of unauthorized assistance.  (*Id.*, PageID #460; ECF No. 34, PageID #518.)  On this point, Plaintiff acknowledges that Defendant has a legitimate purpose in preserving the integrity of its tests.  (ECF No. 30, PageID #490; ECF No. 36, PageID #545.)  These considerations weigh in favor of Defendant.

## II.D.  Efficacy of Means

Plaintiff argues that room scans are not necessary to preserve test integrity.  (ECF No. 30, PageID #490.)  Plaintiff points to other procedural safeguards at Defendant's disposal to guard against cheating and ensure academic integrity.  Specifically, these safeguards include employing proctors to monitor for suspicious movement or using proctoring programs that perform functions like preventing students from accessing the internet or other programs during the test, recording students during tests, and using artificial intelligence to detect suspicious movement or plagiarism.  (*Id.*, PageID #491–92.)

Further, Plaintiff argues that room scans have minimal value for preserving test integrity because there are numerous ways students could cheat that they would not catch.  (*Id.*, PageID #492.)  For instance, students could access their cell phones

or notes in another room, since Defendant does not require students to remain on camera for the duration of the test.  (*Id.*, PageID #493.)  Also, Plaintiff notes that Defendant does not require a room scan; rather, the decision is left to individual faculty in their discretion—a policy that acknowledges that such means are not strictly necessary, but one available option among many.  (*Id.*, PageID #490–91.)

Defendant counters that Plaintiff's proposed alternatives would not fulfill the detection and deterrent functions that room scans do.  (ECF No. 34, PageID #519.) Regarding the proctoring programs Plaintiff suggests, Defendant argues that they are not effective at achieving these purposes and that sometimes they are inappropriate for students with disabilities.  (*Id.*; *see* ECF No. 34-1, PageID #523–24.)

Though reasonableness under the Fourth Amendment does not require employing the least intrusive means, *Earls*, 536 U.S. at 837, the efficacy of the means Defendant has chosen to advance its purpose is a factor in determining reasonableness.  Without question, other procedural safeguards would advance the same purposes—indeed, Cleveland State employs some of them.  Also, pedagogical alternatives to tests for assessing students—for instance, a final project or paper— might minimize or eliminate the need for remote scans.  Plaintiff points to several ways in which students might cheat regardless of the use of room scans.  Besides pointing to the potential deterrent effect, Defendant does not offer much argument or evidence to support the efficacy of room scans.  Perhaps experience with room scans is too recent or not extensive enough to offer much in this regard. Whatever the case, a record of sporadic and discretionary use of room scans does not permit a finding

that rooms scans are truly, and uniquely, effective at preserving test integrity. Accordingly, this factor weighs in Plaintiff's favor too.

*     *     *

Based on consideration of these factors, individually and collectively, the Court concludes that Mr. Ogletree's privacy interest in his home outweighs Cleveland State's interests in scanning his room. Accordingly, the Court determines that Cleveland State's practice of conducting room scans is unreasonable under the Fourth Amendment.

## III.   Remedy

In the second amended complaint, Plaintiff seeks two remedies: a declaratory judgment and an injunction. (ECF No. 17, ¶¶ 62–71, PageID #152–53.) With respect to these remedies, the complaint alleges that "Ogletree and other students at CSU have a reasonable expectation of privacy within their homes" and that the room scans at issue violate Mr. Ogletree's rights "and other students' rights." (*Id.*, ¶¶ 63 & 71, PageID #152 & #153.) Based on these allegations, the parties dispute the scope of any remedy. Plaintiff seeks an injunction prohibiting Cleveland State from using room scans that violate the Fourth Amendment rights of all students, not just Mr. Ogletree. Cleveland State maintains that no injunction is necessary, even as to Mr. Ogletree, and that any injunction must be narrowly tailored to the parties and facts before the Court.

As a threshold matter, the parties advised the Court that Cleveland State modified its policies for using room scans in response to the Court's Opinion and

24

Order.  (*See* ECF No. 38.)  The Court declines to address or consider these developments for two reasons.  First, there is no record before the Court about these changes.  Cleveland State submitted two notices, one to students (ECF No. 38-1) and one to faculty (ECF No. 38-2).  But they are not of evidentiary quality under Rule 56.  Second, the parties have not had an opportunity to test the efficacy of the notices or make any sort of record about their development, implementation in practice, or compliance.  Without a record, the Court cannot offer anything more than an advisory opinion on whether these changes, if implemented effectively, satisfy the Fourth Amendment—an issue that the parties have not briefed in any event.

### III.A. Scope of the Remedy

Plaintiff bases his request for broad remedies that apply to other students, not just Mr. Ogletree, on the equitable power of the federal courts to extend relief for the benefit of non-parties.  In this regard, the Court previously discussed the authority of a district court to issue a universal or nationwide injunction to bind those not parties to the proceedings before it.  *See Skyworks, Ltd. v. Centers for Disease Control & Prevention*, 542 F. Supp. 3d 719, 726 (N.D. Ohio 2021).  Although this case does not involve the sort of executive action that typically sparks debate about such an injunction, some of the concerns that counsel against the exercise of broad equitable remedies in those cases apply here.  For example, "as a general rule, American courts did not provide relief beyond the parties to the case."  *Id.* at 726 (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring)).  And extending a remedy beyond the parties to a case makes courts appear to act outside a judicial

25

capacity.  *See Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020)

(Gorsuch, J., concurring).

Related to an injunction in this case in particular, "district courts are not

categorically prohibited from granting injunctive relief benefitting an entire class in

an *individual suit*."  *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) (citing

*Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Doing so, however, "is rarely

justified."  *Id.*  "Precisely because equitable relief is an extraordinary remedy to be

cautiously granted, it follows that the scope of relief should be strictly tailored to

accomplish only that which the situation specifically requires and which cannot be

attained through legal remedy."  *Workers Int'l Union Local Union No. 215 v.

Consolidated Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982).  Similarly, the

Declaratory Judgment Act empowers courts to declare the rights "of any interested

*party*."  28 U.S.C. § 2201(a) (emphasis added).  On its face, this statutory language

limits the scope of a declaratory judgment to a party.  "Equitable remedies, like

remedies in general, are meant to redress the injuries sustained by a particular

plaintiff in a particular lawsuit."  *Department of Homeland Sec.*, 140 S. Ct. at 600

(Gorsuch, J., concurring).

Therefore, the question becomes whether a remedy that extends beyond

Mr. Ogletree is necessary to provide him the relief to which he is entitled.  It is not.

Although Cleveland State's practices regarding room scans apply broadly and, to

some degree, involve objectively deficient protections for Fourth Amendment rights,

Mr. Ogletree's case also turns to an extent on circumstances particular to him.

26

Moreover, the record contains no evidence that other students have not consented to room scans or have circumstances like Mr. Ogletree's.  Indeed, in the record before the Court, Mr. Ogletree made the only complaint or objection to the room scans. Accordingly, this case does not raise a concern of serial litigation that might overwhelm the courts.

For these reasons, the Court determines that a remedy that extends to other students would be overly broad and is unnecessary to provide Mr. Ogletree the relief to which he is entitled.  *See Sharpe*, 319 F.3d at 273.  To be sure, the relief requested "will benefit not only the claimant but all other persons subject to the practice or the rule under attack."  7A Wright & Miller, *Federal Practice and Procedure* § 1771 (4th ed. 2008).  Other students might well avail themselves of the Court's ruling, but adjudicating any such claims preemptively by extending the remedy would be premature.

### III.B. Remedies

Against that background, the Court considers each of the remedies Plaintiff seeks.

### III.B.1. Declaratory Judgment

"[I]n a case of actual controversy within its jurisdiction," except for certain circumstances not relevant here, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 142 (1967).  Accordingly, Plaintiff is entitled to a declaratory judgment.

Based on its prior Opinion and Order, as amended, the Court declares that Plaintiff Aaron Ogletree has rights under the Fourth Amendment, which apply to the room scans Cleveland State uses in the administration of remote exams and other assessments, and that Mr. Ogletree's privacy interest in his home outweighs Cleveland State's interests in scanning his room.  Accordingly, the Court grants declaratory relief to Plaintiff.  As discussed, this ruling might incidentally benefit other students as well.  As a formal matter, however, the Court limits this declaration to Mr. Ogletree as the party-in-interest who brought suit against Cleveland State.

### III.B.2. Injunction

Generally, before a court may issue a permanent injunction, a plaintiff must demonstrate:  (1) he has suffered an irreparable injury; (2) the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) a permanent injunction serves the public interest.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citations omitted).  Essentially, this standard mirrors the considerations governing the issuance of a preliminary injunction, except that the plaintiff must also show *actual* success on the merits.  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).  While a court balances these factors, it must consider each of them, and "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement."  *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quotation omitted).

For the reasons discussed, Plaintiff proved his claim of a Fourth Amendment violation and established actual success on the merits.  Where a plaintiff establishes the merits of his claim, he need only show (1) a continuing irreparable injury if the court fails to issue the injunction and (2) the lack of an adequate remedy at law. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998).  Mr. Ogletree proved an irreparable injury from the governmental intrusion into his constitutionally protected home, however briefly.  *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing, among other authorities, *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (holding that plaintiffs may establish irreparable harm based on violation of their Fourth Amendment rights)).  Defendant objects that Mr. Ogletree should not receive an injunction because he lacks an ongoing need.  (ECF No. 47, PageID #613.)  In Defendant's view, it is enough that Cleveland State has exempted him from all room scans "until this case is resolved." (*Id.*, PageID #615.)  But Mr. Ogletree's constitutional rights do not depend on the grace of Cleveland State.  The Court sees no reason not to make this voluntary interim measure permanent. So long as Mr. Ogletree remains enrolled at Cleveland State, he remains subject to future room scans that threaten his rights.

As for a remedy at law, the Eleventh Amendment bars an award of damages. *See Platte v. Thomas Twp.*, 504 F. Supp. 2d 227, 247 (E.D. Mich. 2007).  Even if it did not, the Court is hard-pressed to quantify the damages flowing from the constitutional violation at issue.  The remaining factors also favor the issuance of a permanent injunction.  In the balance of hardships, the Court finds that the risk of

29

continuing constitutional violations from the use of room scans that intrude into Mr. Ogletree's home outweighs any burden on Cleveland State from using alternative methods to advance its legitimate interests in ensuring the integrity of tests, securing consent, or otherwise implementing room scans that do not violate the Fourth Amendment. *See Cole v. City of Memphis, Tenn.*, 108 F. Supp. 3d 593, 607 (W.D. Tenn. 2015). Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citations omitted).

*       *       *

Balancing the equities, the Court permanently enjoins Cleveland State, in connection with any exam, test, or other assessment, from subjecting Mr. Ogletree to a room scan that is administered without offering a reasonable alternative or, alternatively, without his express consent.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion for summary judgment and **GRANTS** Plaintiff's motion. Further, the Court **ISSUES A DECLARATORY JUDGMENT** and **PERMANENTLY ENJOINS** Cleveland State from violating Mr. Ogletree's Fourth Amendment rights as stated in this Amended Opinion and Order.

**SO ORDERED.**

Dated:  December 20, 2022

_____
      J. Philip Calabrese
      United States District Judge
      Northern District of Ohio